IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| TIFFANY PRUETT, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   No. 2:09-cv-02600-JPM-cgc |
| | ) |
| GEORGE E. SKOUTERIS, JR., | ) |
| | ) |
|     Defendant. | ) |
| | ) |

**ORDER ADOPTING IN PART AND OVERRULING IN PART MAGISTRATE
JUDGE'S REPORT AND RECOMMENDATION
AND
ORDER ENTERING FINAL DEFAULT JUDGMENT**

This matter is before the Court on Plaintiff Tiffany Pruett's ("Plaintiff") Application (Motion and Memorandum) for Default Judgment (Docket Entry ("D.E.") 11), filed April 30, 2010. On May 12, 2010, the Court referred Plaintiff's Motion to the Magistrate Judge for report and recommendation (D.E. 15). On August 25, 2010, the Magistrate Judge issued a report and recommendation on Plaintiff's motion. On September 7, 2010, Plaintiff filed a timely objection to the report and recommendation (D.E. 19). Upon de novo review, the Court ADOPTS in part and REJECTS in part the report and recommendation.

**I. Background**

This case arises out of Defendant's legal representation of Plaintiff following an automobile accident. On October 9, 2006,

Plaintiff was in an automobile accident in which Plaintiff's fiancée was killed and Plaintiff was injured. (Decl. of Tiffany Pruett ("Pruett Declaration") ¶ 2.) Following the accident, Defendant approached Plaintiff and offered to represent her in the matter. (Id. ¶ 3.) Defendant advised Plaintiff he would not charge a fee for handling her claim because he considered himself to be a family friend. (Id.) Defendant never said anything else to Plaintiff regarding a fee nor did he have Plaintiff sign a fee agreement. (Id. ¶ 4.)

Following her engagement of Defendant, Plaintiff repeatedly asked Defendant about the status of her legal claim. Defendant consistently responded with vague assertions that "he was working on it, and would keep [Plaintiff] posted." (Id. ¶ 6.) Defendant kept Plaintiff uninformed as to the status of her claim until the middle of 2007 when Defendant informed Plaintiff that he had settled her claim for $197,480.00. (Id. ¶ 8.) Defendant never called or wrote Plaintiff to say that he had an offer to settle her claim nor did he ever get Plaintiff's authorization to make a settlement offer or Plaintiff's consent to accept a settlement amount. (Id.)

The exact date when Defendant received the $197,480 is not known. Defendant never provided Plaintiff with a copy of a settlement check or with records of its deposit into his escrow account, despite multiple requests. (Pruett Declaration ¶ 9.)

Defendant received and deposited in his account Plaintiff's case settlement funds in approximately June, 2007. (Id. ¶ 10.)

That month, Defendant began sending Plaintiff checks in amounts between $1,000 and $2,500. (Id. ¶ 10.)  The checks were sent approximately monthly. (Id.) Despite Plaintiff's numerous requests to pay any remaining medical bills and send the full balance of the settlement, Defendant refused Plaintiff's requests. Instead, Defendant continued sending small amounts through mid-August of 2008, "doling it out to [Plaintiff] in small pieces the way that a parent would give a child an allowance." (Id. ¶ 10.)

During this time period, Plaintiff began receiving "dunning" telephone calls from medical providers involved in her treatment following the accident. (Id. ¶ 11.) Plaintiff spoke with Defendant frequently regarding paying these providers. (Id.) Though Defendant told Plaintiff on more than one occasion that he had paid them, Plaintiff learned otherwise each time she contacted a provider to check on the outstanding balance or received a "dunning" call. (Id.)

In August 2008, Plaintiff contacted the firm of Wyatt, Tarrant & Combs, LLP for assistance and Mark Vorder-Bruegge, Jr., Esq. began representing Plaintiff. (Pruett Declaration ¶ 12.) On August 20, 2008, Vorder-Bruegge hand-delivered a letter to Defendant demanding the following:

> Please provide me with a complete accounting of all
> monies you have received and disbursed from or to any
> person or entity, where and under what arrangements
> you currently hold any such monies, and copies of all
> court papers and other documents of any kind which you
> have generated or received from any source, in
> connection with Ms. Pruett.

(Decl. of Mark Vorder-Bruegge, Jr. ("Vorder-Bruegge
Declaration") (D.E. 12) ¶¶ 3-4; Id. at Ex. 1, August 20, 2008
Letter from Mark Vorder-Bruegge, Jr. to George E. Skouteris, Jr.
("Pl.'s August 2008 Demand Letter").) In response to this
demand, Defendant sent a letter dated August 28, 2008 to Vorder-
Bruegge indicating that Defendant was attaching "the settlement
sheet . . . requested showing the disbursements to date" and "a
copy of The Regional Medical Center's Lien for $82,097.35." (Id.
at Ex. 4, August 28, 2008 Letter from George E. Skouteris, Jr.
to Mark Vorder-Bruegge, Jr. ("Def.'s August 2008 Response
Letter").) The letter also stated that Plaintiff had been paid
$67,500 to date and that she would "obviously, be entitled to
more proceeds when the Lien is satisfied." (Id.)

The "Settlement Sheet" provided by Defendant was entirely
handwritten and confirmed the total settlement amount of
$197,480. (Id. at Ex. 4, August 28, 2008 Settlement Sheet.)
Under the section labeled "Less Amounts Withheld for Payment by
Attorney" Defendant itemized purported payments and
corresponding check numbers made to Plaintiff's medical
providers totaling $88,692.90. (Id.)  In the same section,

Defendant listed "Blue Cross" and a balance of $19,191 but there was no corresponding check number provided. (Id.)  Defendant also listed "Partial Proceeds to Client" with two corresponding dollar amounts totaling $67,500. (Id.)

One of the purported payments stated on the Settlement Sheet was check number 1349 to "Regional Medical Center" for $82,097. (Id.) In the margin Defendant wrote "1348.39" out to the side of that line. (Id.) In his declaration, Vorder-Bruegge states that this "caused me to believe at the time that the deductions from Ms. Pruett's settlement proceeds would include a payment by [Defendant] to the Regional Medical Center for $82,075.35." (Id. ¶ 5.) Vorder-Bruegge explains that "[t]he cover letter said that, the enclosed lien said that, the money ($) figure in the enclosed 'settlement sheet' said that, and I had no idea what the "1348.39" marginalia referred to." (Id.)

Prior to Defendant's letter dated August 28, 2008 to Vorder-Bruegge, Plaintiff spoke on the telephone with a representative in the collections department at the Regional Medical Center. (Pruett Declaration ¶ 17.)  The representative told Plaintiff that "they had received and accepted from [Defendant] the payment of $1348.39, a very small fraction of their original claim, because of adjustments or write-downs, and that [Plaintiff's] account was paid in full and [Plaintiff] no longer owed them anything." (Id.)

The small payments from Defendant to Plaintiff stopped in August 2008.  For close to one year, Defendant ceased turning over any of Plaintiff's settlement funds. (Pruett Declaration ¶ 15.)

On October 20, 2008 and again on November 21, 2008, Vorder-Bruegge sent Defendant letters pointing out the insufficiency of Defendant's response to the August 20 Demand Letter and making a formal demand that Defendant disburse the entire remaining balance of Plaintiff's funds.  (Id. at Ex. 2, October 20, 2008 Letter from Mark Vorder-Bruegge, Jr. to George E. Skouteris, Jr. ("Pl.'s October 2008 Demand Letter"), Ex. 3, November 21, 2008 Letter from Mark Vorder-Bruegge, Jr. to George E. Skouteris, Jr. ("Pl.'s November 2008 Demand Letter").)  On December 1, 2008, Defendant sent a letter to Vorder-Bruegge indicating that he was "gathering the documentation . . . requested" and would "be providing that to [Vorder-Bruegge] in the very near future." (Id. at Ex. 5, December 1, 2008 Letter from George E. Skouteris, Jr. to Mark Vorder-Bruegge, Jr. ("Def.'s December 2008 Response Letter").) Defendant also stated that he would "be glad to send [Plaintiff] $2000.00 to help with her financial situation." (Id.) In fact, Defendant did not send Plaintiff any additional funds until almost one year later. (Id. at Ex. 10, Handwritten Summary of Cancelled Checks.)

On December 8, 2008, Vorder-Bruegge reported Defendant to the Board of Professional Responsibility of the Tennessee Supreme Court (the "Board"). (Id. ¶ 8.) On July 8, 2009, the Board sent a letter to Vorder-Bruegge enclosing a copy of documents that it had received from Defendant one month prior. (Id. at Ex. 6, July 8, 2009 Letter from Preston Shipp to Mark Vorder-Bruegge, Jr. ("July 2009 Board Letter").) The documents were sent to the Board by Defendant on June 2, 2009 with a cover letter describing the enclosure as "a copy of Ms. Pruett's file" that was purportedly complete except for "a few more items such as photographs." (collectively "Plaintiff's File") (Id. at Ex. 7, June 2, 2009 Letter from George E. Skouteris, Jr. to Preston Shipp ("Def.'s June 2009 Letter to Board").) Plaintiff's File was slightly less than one inch thick and consisted of eight letters written by Defendant to third parties regarding Plaintiff and copies of Plaintiff's medical records. (Id. ¶¶ 10, 12.) To date, Defendant has refused to provide Plaintiff with her file.

The records provided to the Board gave Plaintiff information for the first time relating to Defendant's representation of her.  The records showed that Defendant never filed any lawsuit on Plaintiff's behalf. (Vorder-Bruegge Declaration Ex. 8, March 27, 2008 Letter from Goerge E. Skouteris, Jr. to John Friffee, III at Farmers Bureau Insurance

Company ("March 2008 Settlement Letter").) Instead, a letter dated March 27, 2007 indicates that Defendant entered into a settlement agreement with Plaintiff's insurance company for $197,480.00 without ever filing suit. (Vorder-Bruegge Declaration Ex. 8, Settlement Letter.)

Several of the letters written by Defendant are on letterhead of Skouteris & Magee PLLC. (Id. at Ex. 4, Def.'s August 2008 Response Letter; Ex. 5, Def.'s December 2008 Response Letter; Ex. 7, Def.'s June 2009 Letter to Board.) Defendant's biography and picture also appeared on the firm's website, www.skouterismagee.com. (Vorder-Bruegge Declaration ¶ 18; Id. at Ex. 14, Screen Print of www.skouterismagee.com/attorneys.php.) Believing Defendant to be a member of that firm, Vorder-Bruegge contacted the firm in late June of 2009 "in a final attempt to avoid [the] necessity" of filing a lawsuit. (Appl. (Mot. and Mem.) for Default J. ("Pl.'s Mot for Default J.") (D.E. 11) ¶18; Vorder-Bruegge Declaration ¶ 18.) Milton Magee and Michael Skouteris, members of that firm, told Vorder-Bruegge that Defendant was not in any way affiliated with the firm, that the firm's letterhead was unauthorized, and that the firm did not know how Defendant's biography had been included on the firm's web page.  (Vorder-Bruegge Declaration ¶ 18.) Following that conversation, letters from Defendant ceased using the Skouteris & Magee PLLC letterhead.  (Id.) On July 2,

2009, Defendant distributed an additional $32,018.05 to Plaintiff through Vorder-Bruegge.  (Pruett Declaration ¶ 18.) To date, Defendant has made no other payments to Plaintiff. (See Vorder-Bruegge Declaration Ex. 10, Nov. 3, 2009 Handwritten Summary.)

In September 2009, Plaintiff asked Vorder-Bruegge to file suit against Defendant to recover the balance of her settlement funds. (Pruett Declaration ¶ 18; Compl. for Lawyer's Conversion of Client Funds and Property ("Compl.") (D.E. 1.).) In Plaintiff's Declaration, she explains her decision: "[A]s a result of information finally accumulating about [Defendant's] handling of my claim and my funds, I felt that [Defendant] was never going to give me the remainder of my funds voluntarily, assuming he still had the funds." (Pruett Declaration ¶ 18.)

On November 3, 2009, after the lawsuit was filed, Vorder-Bruegge received a letter from Defendant which enclosed copies of cancelled checks to Plaintiff along with a handwritten summary of the distributions by Defendant. (Vorder-Bruegge Declaration Ex. 9, November 3, 2009 Letter from George E. Skouteris, Jr. to Mark Vorder-Bruegge, Jr. ("Def.'s November Letter").) By comparing the summary with the cancelled checks, Plaintiff learned that Defendant paid $1348.39 in early August 2008 to the Regional Medical Center as payment in full on Plaintiff's account. (Id. at Ex. 10, Nov. 3, 2009 Handwritten

Summary.) This payment was made prior to Defendant's letter indicating that the Regional Medical Center's outstanding lien was for $82,097.35.  (Id. at Ex. 4, Def.'s August 2008 Response Letter.)

Plaintiff also learned that Defendant, who received the settlement funds by June 12, 2007, made one payment for $690.00 to one medical provider, Cynthia Mealor, in November 2007. (Vorder-Bruegge Declaration Ex. 10, Nov. 3, 2009 Handwritten Summary) Defendant did not make any other payments to a provider until July 2008, more than one year after receiving the settlement proceeds. (Id.) Though Plaintiff begged Defendant on numerous occasions to pay a $19,191.00 bill to Blue Cross/Blue Shield, Defendant never did. (Pruett Declaration ¶ 19.) To date, Blue Cross/Blue Shield is still owed $19,191.00 and continues to "dun" Plaintiff.  (Vorder-Bruegge Declaration at Ex. 13, Letters from Blue Cross/Blue Shield; Pruett Declaration ¶ 11.)

The check records further revealed that two of the distributions to Plaintiff—check number 511 dated June 5, 2008 for $2000 and check number 526 dated June 6, 2008 for $1500—were drawn on Defendant's personal checking account. (Id. at Ex. 10, Nov. 3, 2009 Handwritten Summary; Id. ¶ 14.) All other checks, twenty-five in all, were drawn on an account titled "George Skouteris, Jr. Attorney Escrow Account". (Id. ¶ 14.)

On January 26, 2010, Vorder-Bruegge received another letter from the Board, enclosing the Defendant's most recent correspondence with the Board dated January 20, 2010. (Id. at Ex. 11, January 26, 2010 Letter from Preston Shipp to Mark Vorder-Bruegge, Jr. ("January 2010 Letter from the Board").) The enclosed letter from Defendant to the Board revealed that Defendant was claiming an attorney fee of 33%. (Id. at Ex. 12, January 20, 2010 Letter from George E. Skouteris, Jr. to Preston Shipp ("Def.'s January 2010 Letter to Board").) Defendant's letter to the Board stated that "[t]he fee agreement of 33% was discussed and agreed to but never memorialized in writing." (Id.)

According to the records provided to Plaintiff two and a half years after Defendant received the settlement funds, Defendant distributed a total of $96,518.05 of the $197,480.00 settlement proceeds to Plaintiff in twenty-seven "installments" between June 12, 2007 and July 2, 2009. (Id. at Ex. 10, Nov. 3, 2009 Handwritten Summary.) Defendant paid $7944.29 to Plaintiff's medical providers between November 2007 and August 2008. (Id.) The total settlement amount that remains undistributed to Plaintiff more than three years later is $93,017.66. (Id.; Pruett Declaration ¶ 20.) Since the accident, Plaintiff has been forced to rely on the assistance of others in order to survive financially. (Pruett Decl. ¶ 2.) Defendant's

method of sending "a small amount to help [Plaintiff] out" has led Plaintiff at times to wonder whether she will have enough money to buy groceries, to provide for her children, or to pay for school. (Pruett Decl. ¶¶ 2, 6.)

Following commencement of this lawsuit on September 15, 2009, service was made upon Defendant in accordance with Fed. R. Civ. P. 4 on September 22, 2009 (D.E. 5) giving Defendant until October 13, 2009 to answer.  After being served with the summons, Defendant approached Plaintiff's counsel and requested that the action be resolved through settlement negotiations. (Verified Order to Show Cause (Doc. 6) (D.E. 7) 1-2.) Defendant made assurances to Plaintiff that the settlement funds in question had not been dissipated and would not be put in jeopardy by conducting settlement negotiations. (Id. at 2 n.1.)

Following a prolonged period of default, in which Defendant did not file an answer or otherwise respond to the Complaint, the clerk entered default under Federal Rule of Civil Procedure 55(a) on March 11, 2010.  (D.E. 9.) Plaintiff filed the instant motion for default judgment pursuant to Rule 55(b)(2)on April 30, 2010. (D.E. 11.) Plaintiff requests "default judgment against [Defendant] for compensatory damages in the amount of $93,017.66, punitive damages in the amount of $300,000, authorization for a writ of attachment of all records in [Defendant's] possession relating to his former representation

of [Plaintiff], and all taxable costs of this action." (Pl.'s Mot. for Default J. 12.)

On May 12, 2010, the Court referred Plaintiff's Motion to the Magistrate Judge for report and recommendation (D.E. 15). The Magistrate Judge held a hearing on Plaintiff's Motion on August 18, 2010, at which Plaintiff was present and Defendant George E. Skouteris, Jr. ("Defendant" or "Skouteris") failed to appear.  The Magistrate Judge issued a report and recommendation on August 25, 2010, recommending as follows:

- that Plaintiff's Motion for Default Judgment be granted;
- that the District Court award $93,017.66 in compensatory damages;
- that the District Court award pre-judgment interest to be calculated from July 12, 2007;
- that no punitive damages be awarded;
- that a writ of attachment issue as to Plaintiff's client file; and
- that all taxable costs of the action be awarded. (See D.E. 18.)

On September 7, 2010, Plaintiff filed a Partial Exception to Report and Recommendation (D.E. 19) asserting that the recommendation regarding punitive damages was based on an error of law.  (Pl.'s Partial Exception to Report and Recommendation ("Pl.'s Exception") 1.)

**II. Standard of Review**

The standard of review to be employed by the Court when examining a Report and Recommendation is set forth in 28 U.S.C. § 636. This Court "shall make a de novo determination of those

portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(B)(1)(c). This Court "may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id.

## III. Analysis

### A. Default Judgment

Plaintiff does not dispute the Magistrate Judge's recommendation that Plaintiff's Motion for Default Judgment be granted.   It is undisputed that Defendant did not file an answer or otherwise respond to the complaint. (Default (D.E. 9.).) Moreover, Defendant failed to appear at the hearing on Plaintiff's motion on August 18, 2010. (Magistrate's Report 1.) Upon de novo review, the Court ADOPTS the Magistrate Judge's Report and Recommendation recommending that default judgment be entered against Defendant.

Moreover, the undisputed evidence submitted by Plaintiff is sufficient to support a finding that Defendant committed the intentional tort of converting Plaintiff's property and money. Defendant wrongfully withheld Plaintiff's property-$197,400.00 in settlement proceeds received by Defendant in June 2007. Though Defendant properly used a portion of the proceeds to satisfy outstanding medical liens, Defendant wrongfully denied Plaintiff use of her settlement proceeds during the time he

retained her funds.  Defendant continues to wrongfully retain $93,017.66 of Plaintiff's property over three years later.  In considering the evidence, the Court finds that Defendant wrongfully converted Plaintiff's funds and property. Accordingly, Plaintiff's motion for default judgment is GRANTED.

## B. Compensatory Damages

Plaintiff does not dispute the Magistrate Judge's recommendation that the District Court award $93,017.66 in compensatory damages.  In determining that an award of compensatory damages was proper, the Magistrate Judge found that of the $197,480.00 in settlement proceeds received by Defendant, $93,017.66 remained undistributed. (Magistrate's Report 2.) Upon de novo review, the Court ADOPTS this portion of the Magistrate Judge's Report and Recommendation.  Accordingly, the Court AWARDS Plaintiff compensatory damages in the amount of $93,017.55.

## C. Pre-Judgment Interest Award

Plaintiff does not dispute the Magistrate Judge's recommendation that the District Court award pre-judgment interest to be calculated from July 12, 2007.  In determining that an award of pre-judgment interest was proper, the Magistrate Judge found that Defendant wrongfully denied Plaintiff use of her settlement proceeds during the time he retained her funds. (Magistrate's Report 3.) Upon de novo

review, the Court ADOPTS this portion of the Magistrate Judge's Report and Recommendation.  Accordingly, the Court AWARDS Plaintiff pre-judgment interest at a rate of ten percent per annum to be calculated from July 12, 2007.

**D. Writ of Attachment**

Plaintiff does not dispute the Magistrate Judge's recommendation that a writ of attachment issue as to Plaintiff's client file.  In determining that a writ of attachment should issue, the Magistrate Judge found that Plaintiff is entitled to her client file from Defendant. (Magistrate's Report 5.) Upon de novo review, the Court ADOPTS this portion of the Magistrate Judge's Report and Recommendation. The Court authorizes a writ of attachment for all records in Defendant's possession relating to his former representation of Plaintiff.

**E. Costs**

Plaintiff does not dispute the Magistrate Judge's recommendation that all taxable costs of the action be awarded. In determining that an award of costs was proper, the Magistrate Judge found that Plaintiff's request for costs was reasonable and appropriate.  (Magistrate's Report 5.) Upon de novo review, the Court ADOPTS this portion of the Magistrate Judge's Report and Recommendation. Accordingly, the Court AWARDS Plaintiff all taxable costs of this action.

**F. Punitive Damages**

Plaintiff objects to the Magistrate Judge's recommendation that no punitive damages be awarded.  In determining that an award of punitive damages was not proper, the Magistrate Judge found that Plaintiff did not "present any evidence of Defendant's 'financial affairs, financial condition, and net worth.'" (Magistrate's Report 4.) Reasoning that the "the Court is required to consider a defendant's financial situation in determining an appropriate amount of punitive damages and no evidence of this factor has been presented," the Magistrate recommended that the Court decline to award punitive damages. (Id.)

Plaintiff argues that the Magistrate Judge made an error of law in the analysis of the punitive damages issue. (Pl.'s Exception 1.) Plaintiff asserts that, contrary to the Magistrate's reasoning, lack of evidence on the subject of defendant's financial affairs, financial condition, and net worth is not dispositive of the issue. (Id. at 2.) Though such evidence is one of the factors that may be considered, it is not necessary for a Plaintiff to present any evidence of a defendant's financial condition in order to recover punitive damages. (Id. (citing Anderson v. Latham Trucking Co., 728 S.W.2d 752, 754 (Tenn. 1987).)

The Court agrees Plaintiff.  In Anderson v. Latham Trucking Co., the Tennessee Supreme Court addressed this issue upon plaintiff's Rule Eleven application.  728 S.W.2d 752, 753 (Tenn. 1987).  The Court concluded that "the plaintiff or the defendant . . . *may* offer proof of the financial condition of a defendant . . . but it is not essential or mandatory that the record contain any such evidence to sustain an award of punitive damages." Id. at 754. Thus, the Court must reexamine the issue of punitive damages.

**1. Propriety of Punitive Damages**

Upon an entry of default judgment, it is appropriate for the Court to determine (i) whether punitive damages should be awarded; and (ii) if they are warranted, the amount of punitive damages that should be imposed. Cranfill v. Brew Brothers, Inc., No. 04-1147 T/AN, 2005 WL 1420876, at *1 (W.D. Tenn. June 14, 2005).

Punitive damages "should operate to punish the defendant and deter others from like offenses." Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 900 (Tenn. 1992). Tennessee law authorizes an award of punitive damages in "cases involving fraud, malice, gross negligence, oppression, evil motives, conscious indifference, and reckless conduct implying 'disregard of social obligations.'" Id. at 900-01. These damages should be "awarded only in the most egregious of cases." Id. at 901. Therefore, "a

court may . . . award punitive damages only if it finds a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." Id.

The Court agrees with Plaintiff that the intentional nature of Defendant's conduct in this case is precisely the type of conduct which permits and warrants the award of punitive damages. Defendant settled Plaintiff's claim without consulting with Plaintiff.  He refused to keep Plaintiff informed about the status of her claim and, to date, refuses to turn over records relating to Defendant's representation of Plaintiff.  Defendant has wrongfully retained Plaintiff's settlement proceeds, "doling it out to [Plaintiff] in small pieces the way that a parent would give a child an allowance." (Pruett Declaration ¶ 10.) Even after repeated demands by Plaintiff and Plaintiff's attorney, Defendant refused to turn over the balance of Plaintiff's money or to make a proper accounting of the settlement proceeds. Defendant lied to Plaintiff regarding the payments due to her medical providers, assuring her that they were paid when they were not.  To date, Defendant still refuses to satisfy a $19,000 lien to Blue Cross Blue Shield even though Plaintiff has begged  Defendant on numerous occasions to pay this bill.  As a result, Plaintiff continues to be "dunned" and fears the long-term damage to her credit history. Defendant misrepresented the amount of the Regional Medical Center's lien

to Plaintiff's new counsel, creating the false impression that the settlement funds were subject to an $82,097.35 lien when in fact the Defendant had already satisfied the lien for $1348.39. Defendant assured Plaintiff that he would represent her free of charge but later claimed a contingency fee of 33% despite having never discussed a fee with Plaintiff nor memorializing any fee agreement in writing. Defendant still wrongfully retains $96,518.05 of Plaintiff's money despite investigation by the Tennessee Board of Professional Responsibility and this lawsuit. Moreover, there is a strong basis to infer from his conduct that Defendant diverted Plaintiff's money to his own personal uses. Defendant distributed the settlement to Plaintiff in small amounts over a long period of time.  Two of the payments to Plaintiff were from Defendant's personal checking account, rather than from Defendant's attorney escrow account.

The conduct in this case is even more distasteful because Defendant is an attorney and an officer of the Court. In her motion for default judgment, Plaintiff argues:

> [T]here can be no obligation more vital to a civilized
> system of justice than the obligation of an attorney,
> as a fiduciary, to safeguard and properly turn over
> client funds, and to provide clients with critical
> information about their representation.  These
> obligations have been flagrantly breached in this
> case; the breach has been knowing, intentional, and
> callous in the extreme; and when the occasion arose
> for [Defendant] to refute the assertion of wrongdoing
> or explain his conduct, he did not even deign it worth
> his time to answer the lawsuit despite having had more

> than five months to do so before the Clerk's entry of
> default and six further weeks before the filing of
> this application.

(Pl.'s Mot. for Default J. ¶23.) The Court finds that

Defendant's conduct was egregious, intentional, and fraudulent.

Accordingly, the Court finds that punitive damages are

appropriate.

### 2. Appropriate Amount of Punitive Damages

Under Tennessee law, after the fact finder determines that

a defendant is liable for punitive damages, "the fact finder

shall consider, to the extent relevant, at least the following"

in determining the appropriate amount of punitive damages:

> (1) The defendant's financial affairs, financial condition,
> and net worth;
>
> (2) The nature and reprehensibility of defendant's
> wrongdoing, for example
>
>> (A) The impact of defendant's conduct on the
>> plaintiff, or
>>
>> (B) The relationship of defendant to plaintiff;
>
> (3) The defendant's awareness of the amount of harm being
> caused and defendant's motivation in causing the harm;
>
> (4) The duration of defendant's misconduct and whether
> defendant attempted to conceal the conduct;
>
> (5) The expense plaintiff has borne in the attempt to
> recover the losses;
>
> (6) Whether defendant profited from the activity, and if
> defendant did profit, whether the punitive award should be
> in excess of the profit in order to deter similar future
> behavior;
>
> (7) Whether, and the extent to which, defendant has been
> subjected to previous punitive damage awards based upon the
> same wrongful act;

(8) Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and

(9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.

Hodges v. S.C. Toof & Co., 833 S.W. 2d 896, 901-902 (Tenn. 1992). "[T]he primary purpose of a punitive award is to deter misconduct." Id. at 902.

In addition to state law considerations that bear on the question of punitive damages, the United States Supreme Court has noted that an award of punitive damages is subject to constitutional limitations.  Pursuant to the Due Process Clause of the Fourteenth Amendment, a "grossly excessive punishment" may not be imposed on a tortfeasor.  BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 562 (1996) (internal quotations omitted). "The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."  State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003) (internal quotations omitted).  To determine the reprehensibility of a defendant's conduct, a court must consider whether:

the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of

22

intentional malice, trickery, or deceit, or mere accident.

Campbell, 538 U.S. at 419.

In taking into account these nine factors, the Court finds that the nature and reprehensibility of Defendant's wrongdoing is severe. Defendant stood in a special, fiduciary relationship to Plaintiff as her attorney.  The evidence shows that Defendant wrongfully withheld Plaintiff's money from her at a time when she was financially and emotionally vulnerable.  Through Defendant's willful withholding of Plaintiff's settlement proceeds, Plaintiff was forced to rely on small installment payments from Defendant to support herself and her family for over three years.

The Court further finds that Defendant was aware of the harm being caused to Plaintiff.  Defendant refused to address Plaintiff's repeated inquiries regarding the status of her claim or settlement, assuring her that everything was proceeding normally, making false statements about payments to medical providers, or ignoring her altogether.  Defendant's conduct left Plaintiff in a state of uncertainty, wondering whether she would have enough money to support herself and her children. Defendant knew that Plaintiff had a "dire need for funds" but refused to distribute the full amount the settlement proceeds to Plaintiff.

The Court further finds that Defendant's conduct shows numerous attempts to deceive and mislead Plaintiff.  Defendant attempted to justify his withholding of Plaintiff's funds by implying to Plaintiff's new counsel that the settlement was subject to an $80,000 lien when in fact, Defendant had already settled the lien for $1348.39.  Defendant refused numerous requests from both Plaintiff and Plaintiff's new counsel to produce all records related to her representation, keeping Plaintiff ignorant of the actual amount of her settlement proceeds for almost three years.

Finally, the Court considers "[a]ny other circumstances shown by the evidence that bear on determining the proper amount of the punitive award." Hodges, 833 S.W.2d at 902. The Court finds that Defendant's conduct constitutes numerous and repeated violations[1] of the Tennessee Rules of Professional Conduct.

In considering the facts described in this Order--in particular, the reprehensibility of Defendant's conduct, his knowledge of the harm being caused, his position of authority, and his deceptive course of conduct--the Court hereby awards punitive damages against Defendant in the amount of three hundred thousand dollars ($300,000).

---

[1] See Tenn. S. Ct. R. 8, RPC 1.2(a), 1.3, 1.4(a), 1.5(c), 1.15, 8.4 (2008).

## VI. Conclusion

For the foregoing reasons, IT IS ORDERED that the Magistrate Judge's Report and Recommendation is ADOPTED in part and OVERRULED in part. Judgment shall be entered against Defendant in the amount of $93,017.55 in compensatory damages and $300,000 in punitive damages. It is FURTHER ORDERED that Plaintiff shall be awarded pre-judgment interest at a rate of ten percent per annum to be calculated from July 12, 2007. It is FURTHER ORDERED that Plaintiff shall be awarded all taxable costs of this action. It is FURTHER ORDERED that a writ of attachment shall issue for all records in Defendant's possession relating to his former representation of Plaintiff.

**SO ORDERED,** this 27th day of September, 2010.

/s/ JON PHIPPS McCALLA
CHIEF UNITED STATES DISTRICT JUDGE